Filed 3/16/21  P. v. De Los Santos CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CESAR DE LOS SANTOS,<br><br>    Defendant and Appellant. | B303616<br><br>(Los Angeles County<br>Super. Ct. No. PA090769) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Hilleri G. Merritt, Judge.  Affirmed with directions.

Spolin Law, Aaron Spolin and Caitlin Dukes for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Roberta L. Davis and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an amended information filed by the Los Angeles District Attorney's Office, defendant and appellant Cesar De Los Santos was charged with two counts of criminal threats (Pen. Code, § 422, subd. (a); counts 2 & 5),[1] three counts of assault with a firearm (§ 245, subd. (a)(2); counts 3, 4, & 6), and one count of vandalism over $400 in damage (§ 594, subd. (a); count 7). As to counts 2 and 5, it was alleged that a principal was armed with a firearm during the commission of the offenses (§ 12022, subd. (a)(1)).

Defendant pled not guilty. During trial, the prosecutor submitted on count 7 as a misdemeanor. After trial, the jury found defendant guilty on all charges and found true the firearm allegations on counts 2 and 5. He was sentenced to six years in prison.

Defendant timely appealed. On appeal, he argues: (1) he was denied due process and a fair trial because (a) the trial court was biased against him and defense counsel and (b) the trial court committed misconduct by repeatedly interrupting defense counsel's examination of witnesses and "[d]enigrating" defense counsel in front of the jury; (2) prosecutorial misconduct compels reversal; and (3) because the abstract of judgment erroneously indicates that defendant was convicted on count 6 of criminal threats, it must be corrected to accurately reflect his conviction for violation of section 245, subdivision (a)(2), assault with a firearm.

We agree with the parties that the abstract of judgment must be corrected. In all other respects, the judgment is affirmed.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL BACKGROUND

## I. *Prosecution evidence*

On February 16, 2018, Yareth Herrera[2] was at her house in Los Angeles.  Her father (Mario Rene Herrera), mother (Ana Alvarez De Herrera), and three siblings (Lindsey Herrera, Allison Herrera, and Aden Herrera) were also home.

At approximately 5:00 p.m. to 5:30 p.m., defendant went to the Herreras' house asking for Michael Herrera.  Michael, who was Mario's son from a previous relationship, sometimes stayed in the shed located behind the main house.  Defendant said that his name was "Cesar" and that he was Michael's friend.  Mario told defendant that Michael did not live in the house.  Defendant insisted, "'Yes, he's here.'"  Defendant eventually left.

At approximately 7:00 p.m., Yareth was in the front bedroom when she heard someone knocking on the screen door.  Ana was on the bed nursing her infant son Aden.  Mario was in his bedroom and could hear the loud knocking.  When the knocking became increasingly louder, Ana opened the bedroom window to see who it was.  Defendant was standing outside wearing a hoodie over his head.

Ana asked defendant what he wanted and he replied that Michael owed him money.  Defendant demanded payment of Michael's debt.  He threatened to kill the family, and said, "'You'll see what's going to happen.'"  He then left briefly and returned with another man who was shorter and "chubb[ier]" than defendant.  The man left for a few seconds and came back with a "large . . . long" black rifle approximately two to three feet long.

---

[2]  Because the family members share the same last name, we refer to them by their first names.  No disrespect is intended.

Defendant told the gunman to kill everyone. The gunman pointed the weapon at Ana, Aden, and Yareth, and said that he was going to kill them. Ana, who was holding Aden, went down to the floor, and Yareth begged the gunman not to shoot. When the gunman lowered the weapon, Yareth ran towards the hallway. Ana also ran out of the room with Aden in her arms. Yareth ran into her father in the hallway and told him that there was someone at the door. She then went into her sister's bedroom and called the police. Yareth hid in the closet while she was talking to the 911 operator.

The 911 call was played for the jury. During the call, Yareth told the operator, "They're gonna kill us right now with a rifle." Yareth also said, "There was a young man that came . . . trying to kill us." Yareth added that "they broke our window." And, she stated that "my half-brother owed them money and that he was gonna come and kill us because of him."

After the 911 call, Yareth was running through the hallway when she saw the gunman throw a chair towards the bedroom window. She heard the glass shattering. Ana was also in the hallway when she heard things being thrown at the windows and glass breaking. Mario also heard the windows breaking so he went to the kitchen and retrieved a machete that he kept on top of the refrigerator. Through the kitchen window, Mario saw defendant standing outside the front door. Mario opened the front door and stood guard behind the closed screen door while holding the machete in his hand. The man who was breaking the windows had a "short shotgun." Mario saw the gunman raise the weapon towards the bedroom window. Either defendant or the gunman picked up a rock and threw it through the kitchen

4

window. Thereafter, they ran away. Before defendant left, he said he was going to come back.

At approximately 7:30 p.m., Los Angeles Police Officer Victor Salguero responded to the Herreras' residence. Officer Salguero interviewed Mario and Ana. They reported that one of the men who had threatened their family had shown up earlier in the day and that his name was Cesar. Yareth told Officer Salguero that the gunman pointed the rifle at her family and said, "'Today is the day.'"

The entire incident was captured on the Herreras' home surveillance cameras. The video footage was played to the jury. The man identified as defendant in the video footage had a marijuana leaf tattooed on his right leg. At trial, the jury was shown a photograph of defendant's right rear calf with a marijuana leaf tattoo. Yareth also reviewed the surveillance footage from earlier in the evening and recognized defendant walking back and forth on the side of her house. After the incident, Yareth and Ana went outside and saw their front porch chairs "all over the place," and the bedroom and kitchen windows broken. There was also a "very big rock" in the kitchen that used to be on the front porch.

On February 20, 2018, Los Angeles Police Detective Bonnie Lehigh showed the Herreras a six-pack photographic lineup. Yareth identified someone other than defendant as the person who first approached her bedroom window. Ana and Mario could not identify anyone. Defendant's photograph was not included in this lineup.

5

On April 3, 2018, Detective Lehigh showed the Herreras a second six-pack photographic lineup. This time, Yareth, Ana, and Mario all identified defendant's photograph as that of the person who threatened to kill their family.

II. *Defense*

Defendant presented no evidence on his behalf.

## DISCUSSION

I. *Judicial Bias*

Defendant contends that the trial court showed bias against him by: (1) unnecessarily interrupting his trial counsel's examination of witnesses with needless sidebar conferences; (2) disparaging trial counsel in front of the jury; and (3) expressing animosity against defendant when he was late to court.

    A. <u>Factual background</u>

        1. *Interruptions during witness examinations*

            a. <u>Michael is unavailable</u>

Before trial, the trial court held an Evidence Code section 402 hearing with Michael during which he refused to answer any questions. The trial court ultimately found him to be unavailable as a witness. The prosecutor later asked whether defendant was seeking to introduce third-party culpability evidence by "proceed[ing] with the route [concerning] Michael Herrera." The trial court asked defense counsel whether he was "trying to bring in third-party culpability . . . as your defense," and counsel replied, "No."

            b. <u>Ana's testimony; sidebar conferences; Evidence Code section 402 hearing</u>

Ana testified on direct examination that Michael was not allowed to come into her house but sometimes stayed in the shed

6

located in the rear portion of her property.  She described in detail the specific location of various buildings on her property and their access points from outside.

During the cross-examination, defense counsel asked Ana whether she had seen Michael on her property on the day of the incident.  When Ana said no, defense counsel asked whether it was possible that Michael had entered the property without her knowledge "given the size of the compound."  The prosecutor objected on relevance and speculation grounds, and the trial court sustained the objections.  Defense counsel rephrased his question and asked Ana whether it was possible for someone to enter the property without her knowledge if she had been inside the house.  The trial court again sustained the prosecutor's objection on grounds of speculation.  When defense counsel began asking a series of questions regarding the characteristics of different entry points to the property, the trial court asked the attorneys to approach for a sidebar conference.

At sidebar, the trial court asked defense counsel why he was focusing on Michael since defendant was not pursuing a third-party culpability defense.  Defense counsel responded that he was trying to find out who was on the property when the incident occurred.  The trial court asked defense counsel what would be the relevance of whether Michael was on the property, especially because Michael "will not make himself available" for testimony.  The trial court explained that "this trial is not about Michael Herrera.  He may have been the reason why they were there, but all that these witnesses can testify to from what they've said is that he wasn't in that front house."  The trial court added that asking a witness if something is possible is speculative because "[j]ust about anything is possible."

The trial court again asked counsel what the relevance was under Evidence Code section 352 in asking whether Michael was on the property if he was unavailable to testify and defendant was not pursuing a third-party culpability defense. Defense counsel insisted that he was "allowed to question the witnesses on their abilities to perceive events" and "their abilities to perceive who else may have been present at the time."

The trial court ruled as follows: "[T]he only relevance under [Evidence Code section] 352 to establish all the parameters of the gate and someone hopping it and ingress and egress would be if either, one, you're doing a third-party culpability defense, which you indicated in the very beginning you were not, or two, if you're trying to establish somehow Michael Herrera is a logical witness who could have been called by the People when, in good faith, they tried, and he won't, but that can't come before the jury. [¶] . . . [¶] If you want to go into the compound and gate heights and ingress and egress because you think that's relevant outside of the two arenas I've discussed, you can. I'm not going to stop you. [¶] I came side-bar because I wanted to make sure you weren't going into territory that I think is unfair and, under my rulings, improper because [] you've already conveyed to the court and counsel a defense you're not pursuing."

As Ana's cross-examination continued, defense counsel asked the trial court to mark several photographs as exhibits, one of which was a photograph of Michael taken from the surveillance camera. Defense counsel explained that he wanted to ask Ana whether she had seen the surveillance camera footage showing Michael on the property even though she had testified that she was not aware he had been there. The prosecutor

argued that such evidence would be irrelevant and likely to confuse the jury.

The trial court ordered an Evidence Code section 402 hearing to explore any potential impeachment evidence.

During the evidentiary hearing, Ana testified that she did not recall seeing Michael on her property on the day of the incident. When defense counsel asked Ana whether she had seen any surveillance footage showing Michael on her property, she answered, "I don't remember. No." Defense counsel showed Ana the photograph of Michael taken from the surveillance camera and continued to ask her questions about it. At some point, the trial court sustained the prosecutor's objection for lack of foundation and the following exchange took place:

"The Court: [Defense counsel], . . . I'm not quite sure. You wanted to know—I don't want to say this in front of the witness because I want you to be able to have unbiased testimony. I don't think there's anything more you can get from this photograph.

"[Defense counsel]: I'm sorry. I have to object, your Honor. I don't believe we established whether this witness understands English. The purpose of your Honor talking without the interpreter—I don't understand what's going on.

"The Court: I didn't say anything.

"[Defense counsel]: You said you didn't want to say this in front of the witness because you might affect her testimony.

"The Court: I'm trying to speak very generically. The objection was relevance . . . or lack of foundation. I'm sustaining the objection. You asked what she recognized. She recognized him standing so far.

"[Defense counsel]: I'm sorry. There was some other further commentary, though. I didn't understand.

"The Court:  Ask your next question."

Defense counsel resumed his examination and asked several additional questions about the surveillance camera system.  The trial court then called for a sidebar conference and asked the relevance of whether Michael had been on the property earlier in the day when defendant was not pursuing a third-party liability theory and the unavailability of Michael as a witness could not be brought up in front of the jury.  Defense counsel responded that he was allowed to impeach the witness's credibility.  The trial court repeatedly asked the relevance of this line of inquiry under Evidence Code section 352.  Defense counsel insisted that the "relevance is whether or not she had knowledge of that.  She said she didn't.  If she actually did and said she didn't, then that goes to her credibility.  It's a conflicting statement."

Ultimately, the trial court ruled:  "She said she doesn't remember.  If you want to ask her that in front of the jury, if she knows.  If she was shown that surveillance video and she can't remember, that's it."

When the cross-examination resumed, defense counsel asked Ana whether Michael was "present while you were there that evening."  She answered, "No."  She reiterated, "I didn't see him [that evening]."

> c. <u>Mario's testimony; sidebar conferences; trial court objections</u>

Mario testified that after the incident involving defendant, he installed a block wall and a metal gate in front of his property as "precaution . . . for people not to be able to access it easily."  During cross-examination, defense counsel asked whether Mario had built the new block wall and metal gate to prevent Michael

10

from coming onto the property, and Mario said no.  When defense counsel asked whether the police had responded to his residence two days after the incident with defendant, the trial court called for a sidebar conference.

The trial court asked defense counsel why he was inquiring about a police investigation regarding Michael.  Defense counsel explained that he was entitled to establish that the police were called out two days after defendant's incident because Ana did not want Michael on her property and that the new fence was built because of the family's fear of Michael, not defendant.  The trial court countered, "But that's how [Mario] testified."  Defense counsel argued that he should be able to point out to the jury that Mario was being disingenuous.  The trial court ruled that under Evidence Code section 352, "this goes to weight, not admissibility . . . .  It can be explored only so far as two days later, the police came because of Michael, but then we're dropping it."

Defense counsel thanked the court, and said, "That's all I want to point out."

When the cross-examination resumed, defense counsel asked whether the police had shown up at his house on February 18, and Mario answered, "Yes, several times, but I don't remember the date."  When defense counsel asked whether the police had shown up because of Michael before the new wall was built, the trial court interjected, "I'm vague as to time because there have been several instances now testified to as to the police being called regarding Michael.  If you could just clarify."  Defense counsel asked for a clarification and the trial court stated, "I'm sustaining my own objection.  It's vague as to the time.  There's been several instances of testimony about police

11

showing up because of Michael being there.  Your question was unclear as to time."

Mario also testified that he built the new wall because his children "didn't feel safe before because anybody could access [the property] easily."  When defense counsel asked whether the children did not feel safe because of Michael or defendant, Mario responded, "I built it for any . . . person."

During the cross-examination, defense counsel also asked Mario, "Did you tell the police at any point what [defendant's] last name was?"  Mario responded, "No."  The prosecutor objected and asked for a sidebar conference.  Defense counsel stated, "I'm going to object to the interruption."  The trial court requested a readback of the last question and called the parties for a sidebar conference.

The prosecutor expressed a concern that defense counsel may be going into an area covered by the trial court's ruling concerning Michael's unavailability.  She explained that Mario had learned defendant's last name from Michael, and that statement would be inadmissible hearsay.  The trial court ultimately ruled that defense counsel could ask Mario about how he discovered defendant's last name.  Defense counsel asked the court for permission to re-ask Mario whether he had given the police defendant's last name.  The request was denied because the trial court had already asked for a readback of the last question.  Then the following exchange took place:

"[Defense counsel]:  It does interrupt the flow of my cross-examination every time we come in the back . . . .  Every time we stop, it interrupts my flow with the witness.  So if we're just back here saying—at the end of the day, the decision is, yeah, I can say that, but we've spent 15 minutes talking about it and—  [¶]  . . .

12

[¶] it really interrupts the flow of my cross. . . . [I]t's starting to . . . interrupt with my ability at this point. I don't understand why we keep coming back.

"The Court: We can start doing this in front of the jury if you'd like.

"[Prosecutor]: I'm entitled to make objections.

"The Court: The reason we come back here is because my courtroom is such, the only place they're not going to hear me is back here. The whole point of the side-bar is that they not overhear what we're saying. [¶] If you want me to start making the rulings in front of the jury, if I feel that I can, I will. Anyway, you can explore, but do it quickly because it's really irrelevant, at the end of the day, how he got the last name. If you want to go there, go there, but it's going to be a short thing because this trial is not about Michael Herrera."

When the cross-examination resumed, defense counsel asked no further questions on how the police learned about defendant's last name.

                 d. <u>Detective Lehigh's testimony; sidebar</u> <u>conferences</u>

While cross-examining Detective Lehigh, defense counsel began asking a series of questions regarding the gunman who was with defendant during the incident who was referred to as the "'chubby man'" throughout the trial. Defense counsel said, "Let's talk about the investigative actions that you took to locate the chubby man," and the prosecutor objected as irrelevant. The trial court called for a sidebar conference and asked defense counsel for the relevance for this line of inquiry. Defense counsel explained that he wanted to inquire about the investigative techniques used in this case. The prosecutor asserted that the

13

case was about defendant, not the chubby man. The trial court disagreed with the prosecutor and said that the chubby man was "front and center" in the case because the People's theory of liability for the assault charges against defendant was that he was an aider and abettor. The trial court warned defense counsel to stay away from any questions regarding Michael, but overruled the prosecutor's relevance objection as to the questions related to the chubby man.

Defense counsel continued to cross-examine Detective Lehigh regarding the efforts expended in locating the chubby man. The trial court asked the parties to approach for a sidebar conference and expressed a concern that Detective Lehigh "appears confused," and that she might get into possible gang evidence, which the trial court had ruled inadmissible. Defense counsel asked why they were having a sidebar conference. The trial court explained: "Sometimes after [Evidence Code section] 402's are done, a witness is questioned and doesn't know how to answer, that it might go into an area 402'd out. [¶] The detective seems confused by questioning. I don't know this case. I don't know if she's going to blurt the way she found him or looked through some sort of gang thing. I don't know. I'm trying to avoid any problem with the court's prior ruling. [¶] . . . I'm doing my best to make sure this case is as fair as possible. That's why we're here."

Defense counsel answered that he had no intention of getting into any gang evidence and argued that if the trial court was concerned about the witness going into an area that had been ruled out, it should clear the courtroom and admonish the witness not to do so. The trial court reiterated that it was trying to make sure that everyone received a fair trial.

14

Detective Lehigh also testified that the rifle used was not located. She did not attempt to obtain a search warrant for defendant's house, and she did not interview defendant because she had assumed that he had a lawyer. She added that she regretted not attempting to interview defendant.

2. *Alleged disparaging treatment of defense counsel in front of the jury*

During trial, outside the presence of the jury, defense counsel told the trial court that he had an issue that he wanted to make clear on the record: "I would like to make it clear for the record that I noticed yesterday, and some members of . . . my client's family came up to me, my own client, myself, I noticed it, and my paralegal, there are times throughout this trial where your Honor has rolled her eyes at me and made voice inflections like you just did indicating some sort of disapproval of me or something. If my client's family sees that and my client and I noticed it, I'm worried that the jury notices that. [¶] So I'm going to ask that your Honor please . . . not speak in voice inflections, rolling eyes, and . . . I'm afraid that it could affect my client getting a fair trial."

The trial court denied the accusations: "So now that you've put this at issue on the record, let me make the record very, very clear. . . . [¶] I make sure that it is a very fair trial. I am not saying or doing anything. We all know what happened on the record yesterday in chambers, [defense counsel]. The jury has no idea. It will not affect how I deal with your client. I will always make sure that when an attorney does something they're not supposed to do, I will not in any way, shape, or form take that out on the client. It's not fair and it's not right. [¶] But to sit here and impugn me that [way] because maybe you don't like my

rulings or maybe you feel things are or are not going your way, somehow I am inserting myself or doing something, it is offensive, and I do believe that it is unwarranted. [¶] I want the record to be clear, I don't roll my eyes. I am not speaking in any particular way. . . . [¶] So I want the record to be very clear that I disagree. I don't roll my eyes. I'm not 16. You may not like what I say, but I make sure when the jury is present, that neither side has any advantage or disadvantage over one another."

During Detective Lehigh's cross-examination, the following exchange took place:

"[Defense counsel]: Isn't it true that you could have authored a search warrant to go to [defendant]'s house as soon as he became a suspect based on the information that you have?

"[Detective Lehigh]: I could have, but I did not.

"[Defense counsel]: You didn't do that because you thought, 'That was two months ago. It was a long time ago,' right? 'Something could have changed,' right?

"[Detective Lehigh]: Yes, as I've already indicated.

"[Defense counsel]: Right. So why bother. [¶] Now, you also—

"[Prosecutor]: Objection, argumentative.

"The Court: Okay. It's really important, [defense counsel], to just ask questions. Make no commentaries on the evidence, please."

3. *Alleged animosity towards defendant*

After the case was submitted for the jury's deliberation, the trial court ordered defendant to "stay until 4:00. That's when the jury is going to break. Then you're ordered to return here tomorrow morning at 9:00 a.m. without any further order, notice, or subpoena." The trial court asked defense counsel to be

16

"available tomorrow within a half-hour of the court," and counsel responded that he would.

The following day, the jury resumed deliberations at 9:13 a.m. At 10:15 a.m., the trial court held a hearing to address a jury question. Defense counsel appeared telephonically, but defendant failed to appear. The trial court noted, "We cannot find [defendant], even though he was told to wait in the hallway. He's not there, according to my bailiff."

At 10:36 a.m., when defense counsel arrived in person, the trial court called the matter on the record with defendant still being absent. The trial court discussed defendant's absence as follows: "To give a little history, I ordered him back yesterday at 9:00 a.m. He was not here. We called [defense counsel]. [Defendant] was under the mistaken opinion that he could be on call like his attorney. [¶] [Defense counsel] did get ahold of [defendant]. [Defendant] did show up around 9:30, 9:40. He was told by my bailiff to wait in the hallway, and he has now taken himself out of the . . . courthouse to get a cup of coffee. We were told it was a five-minute time estimate ten minutes ago. [¶] I am taking this verdict with or without [defendant]. This is not the mall. This is a court of law, and he's treating it like the most casual thing in the world, and I find that offensive, [defense counsel]. [¶] This is not on you. You're not your client. He knows exactly what he needed to do. I ordered him back. Then he was told to wait in the hallway, and he decided he was going to go grab a cup of joe, so I'm not going to wait anymore."

At that point, the bailiff informed the trial court that defendant had entered the courthouse. When defense counsel asked for an opportunity to respond to the trial court's comments, the trial court said, "I'm not going to do this. We're going to wait

17

for your client.  We're going to bring the jury out.  They've been waiting for the better part of half an hour after buzzing they have verdicts, and we're going to get your client in and hear what the verdicts are."  Counsel again asked for an opportunity to respond and the trial court allowed him to do so.  Counsel argued that defendant had been "present and prompt for every proceeding and every hearing of this trial."  He also said, "[Defendant] left the hallway to get a cup of coffee because he's awaiting a verdict with his family."

The trial court corrected counsel and said that defendant had left the building, not the hallway, and that he had been ordered to be in court at 9:00 a.m.  Counsel argued that defendant should be given "the benefit of the doubt," and that "this is being a little overblown."  The trial court responded, "I don't think I'm blowing it out of proportion. . . .  When I order someone back, I expect them back.  When they're told not to leave the building, I don't think it's unreasonable to feel he is disrespecting the court."

B. <u>Applicable law</u>

A criminal defendant "has a due process right to an impartial trial judge under the state and federal Constitutions. [Citations.]"  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)  The constitutional right to due process "requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case. [Citation.]"  (*Ibid*.)  "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient.  Instead, based on an objective assessment of the circumstances in the

18

particular case, there must exist "'the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable.'" [Citation.]" (*People v. Freeman* (2010) 47 Cal.4th 993, 996.) "[I]t is the exceptional case presenting extreme facts where a due process violation will be found. [Citation.]" (*Id.* at p. 1005.)

In reviewing a claim of judicial misconduct or bias on appeal, the appellate court must assess whether any misconduct or bias that is proven was so prejudicial as to deprive the defendant of a fair trial. (*People v. Guerra, supra*, 37 Cal.4th at p. 1112.) "Indeed, '[o]ur role . . . is not to determine whether the trial judge's conduct left something to be desired . . . . Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' [Citation.]" (*People v. Snow* (2003) 30 Cal.4th 43, 78.)

C.  No forfeiture

The People assert that defendant forfeited this contention on appeal because he did not object below.

"As a general rule, a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320.)  That said, "[a] claim of pervasive judicial bias does not necessarily require an objection to be preserved because such an objection may be futile." (*People v. Banks* (2014) 59 Cal.4th 1113, 1177, abrogated on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

Here, the appellate record demonstrates that defendant did object after the trial court had pulled counsel aside several times. That said, we note that defense counsel did not expressly object on the grounds of judicial bias.  But, based upon the tense

dialogue between the trial court and defense counsel, defense counsel likely believed that an objection on the grounds of judicial bias would have been futile. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.) Accordingly, we turn to the merits of defendant's arguments.

D. <u>The trial court's conduct and comments do not demonstrate improper bias</u>

Defendant first contends that the trial court acted as a "de facto second prosecutor" by repeatedly lodging its own objections to defense counsel's questioning and holding "needless sidebars" that "discredited" defense counsel in front of the jury and hampered his ability to effectively examine witnesses. To the contrary, the record shows that the trial court treated defendant and his counsel fairly and the sidebar conferences were necessary to ensure a fair trial.

Most of the instances cited by defendant as exemplifying the trial court's alleged bias involved defense counsel's attempts to introduce evidence related to Michael. Specifically, the first sidebar conference during Ana's testimony occurred because of defense counsel's attempts to inquire about Michael's access to the property and whether he could have been present during the incident. The second sidebar conference, which occurred during Ana's Evidence Code section 402 hearing, was also triggered by defense counsel's questions about the surveillance camera capturing Michael's presence on the property. As to Mario's testimony, the first sidebar conference involved defense counsel's questions on whether Mario had installed a new block wall because of Michael, while the second sidebar conference was to discuss how Mario had learned about defendant's last name from Michael.

However, as the trial court repeatedly reminded defense counsel, any evidence related to Michael was irrelevant because he was found unavailable as a witness and defendant was not pursuing a third-party culpability defense.

The trial court has the duty "to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044; see *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1080–1081, overruled in part on other grounds in *People v. Gutierrez* (2014) 58 Cal.4th 1354 [trial court properly exercised its broad discretionary power to control the proceedings in the courtroom]; *People v. Carlucci* (1979) 23 Cal.3d 249, 255 [trial court has a statutory duty to control trial proceedings, including the introduction and exclusion of evidence].) Since the trial court's concerns for the admissibility of any evidence related to Michael were justified based on its pretrial evidentiary rulings and defense counsel's prior statements about the defense strategy, the sidebar conferences were necessary to ensure a fair trial and did not demonstrate any judicial bias.

The same is true of the sidebar conferences held during Detective Lehigh's testimony. The first sidebar conference was triggered when the prosecutor objected to defense counsel's questions about "the investigative actions" related to the "chubby man." During the sidebar conference, the trial court asked for the relevance of such evidence and defense counsel explained that he wanted to explore the investigative techniques used in this case to locate the chubby man. The trial court ultimately agreed with defense counsel and found that the questions were relevant

because the chubby man was "front and center" in this case since defendant was being prosecuted on an aider-and-abettor theory of liability. The second sidebar conference was held after the trial court noticed that Detective Lehigh appeared to be "confused" and it became concerned that the witness might possibly get into gang evidence, which had already been ruled inadmissible. During the conference, defense counsel assured the trial court that he had no intention of getting into any gang evidence.

In both of these instances, the record demonstrates that the trial court was properly exercising its broad discretionary power to control the proceedings and ensuring that defendant received a fair trial. (See *People v. Ybarra*, *supra*, 166 Cal.App.4th at pp. 1080–1081; *People v. Carlucci*, *supra*, 23 Cal.3d at p. 255.)

Defendant also contends that the trial court disparaged defense counsel in front of the jury when it admonished counsel to "[m]ake no commentaries on the evidence", and engaged in "non-verbal displays" of "dissatisfaction and annoyance with defense counsel." However, the trial court's admonishment to defense counsel to refrain from making personal commentaries on the evidence was necessary because counsel did make a sarcastic comment regarding Detective Lehigh's failure to seek a late search warrant. As to defendant's allegations that the trial court repeatedly rolled its eyes and used verbal cues to express disapproval of defense counsel, the trial court adamantly denied such behavior. Although defense counsel stated that defendant's family members and his paralegal had observed the trial court's alleged intemperate behavior, no witnesses testified to corroborate counsel's accusations. Indeed, the record fails to demonstrate that the trial court behaved in an inappropriate manner.

22

Finally, defendant contends that the trial court demonstrated animosity towards him when he "was late returning from the break because he had briefly left the courthouse." However, defendant's description fails to accurately portray the magnitude of his disrespectful and disruptive behavior.

After the presentation of evidence had been completed and the matter had been submitted to the jury for deliberation, the trial court ordered defendant to return the next day at 9:00 a.m. The following day, defendant was late and arrived at approximately 9:30 a.m. to 9:40 a.m. Despite the bailiff's instruction to remain in the hallway, defendant left the courthouse to get coffee and failed to be present for a hearing to discuss a jury question at 10:15 a.m. Defendant finally returned to the courthouse sometime after 10:36 a.m. Because of defendant's failure to obey the trial court's orders, the jury had to wait for approximately 30 minutes after notifying the trial court that it had reached a verdict.

In light of defendant's tardiness and lackadaisical attitude towards the trial court and the jury, the trial court's response to defendant's brazen behavior was hardly "exaggerated", but was rather amply justified and well within its broad authority to control the trial proceedings. (*People v. Ybarra, supra,* 166 Cal.App.4th at pp. 1080–1081.) Therefore, defendant's judicial bias claim fails.

E. <u>Any error was harmless</u>

Even if the trial court had erred, which it did not, any alleged error would have been harmless under any standard of review. (*People v. Sturm*, *supra*, 37 Cal.4th at p. 1244.)

The record does not reveal that the trial judge repeatedly belittled defense counsel in front of the jury, unduly favored the prosecution, or created the impression that it was aligned with the prosecution. (Compare *People v. Sturm*, *supra*, 37 Cal.4th at pp. 1233, 1234–1236, 1238 [trial court "engaged in a pattern of disparaging defense counsel and defense witnesses in the presence of the jury, and conveyed the impression that he favored the prosecution by frequently interposing objections to defense counsel's questions"].) In addition, in its instructions, the trial court admonished the jury to "not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." Jurors are presumed to have followed the court's instructions. (*People v. Young* (2005) 34 Cal.4th 1149, 1214.)

Moreover, the evidence against defendant was overwhelming. Yareth, Ana, and Mario all testified that defendant went to their house with another man armed with a rifle and threatened to kill the whole family if they refused to pay Michael's debt. All three witnesses identified defendant out of a photographic lineup. And, the entire incident was captured on the victims' home surveillance cameras. Given the abundance of evidence establishing defendant's guilt, any alleged error by the trial court was harmless.

24

II. *Prosecutorial Misconduct*

Defendant claims that the prosecutor committed misconduct during closing arguments by disparaging defense counsel and accusing him of calling her names.[3]

A. <u>Factual background</u>

1. *Prosecutor's closing argument*

During the closing argument, the prosecutor began by stating, "I'm not going to go through every piece of evidence in detail, but I'm going to give you a brief summary of what the evidence has showed so far." She first summarized the evidence chronologically, and then discussed the applicable law on each of the criminal charges.

Towards the end of her argument, the prosecutor stated that she expected defense counsel to argue that the police investigation in this case was less than perfect: "Now, I am not a mind reader, but I anticipate when the defense gets up here, he will speak to you at some length about the police investigation and that he will allege the investigation was subpar or not as good as it should be, so I want to take a moment to pause. [¶] I will admit the investigation was not perfect in this case. No case I've had ever, [was it]. We are human beings. The police are human beings. As Detective Lehigh has acknowledged, there are things she could have done and things, in retrospect, she learned from." The prosecutor concluded her argument by reminding the jury that the case was not about the police but whether defendant was guilty of the charged crimes beyond a reasonable doubt.

---

[3] Defendant also argues that the trial court allowed the prosecutor to disparage defense counsel during her closing arguments by refusing to admonish the jury to ignore those remarks.

## 2. *Defense closing argument*

During the defense closing argument, counsel spent most of his time discussing the police investigation and its shortcomings. He discussed Detective Lehigh's failure to obtain a search warrant to search defendant's residence or to obtain an interview from defendant by assuming that he would "lawyer up." Defense counsel also criticized the decision not to look for the rifle used during the incident. He highlighted the conflicting testimony from the prosecution witnesses and argued that there was no corroborating evidence.

While discussing the concept of reasonable doubt, defense counsel said, "I want to talk about reasonable doubt. I'm not going to bother talking about the law because there's so much doubt. Reasonable doubt is not an impossible thing. It's easy to prove. They did it." Defense counsel argued that although the prosecutor had proven beyond a reasonable doubt that defendant was at the Herreras' house twice on the day of the incident, she had failed to prove that defendant had committed any crime.

While discussing the charge of criminal threats, defense counsel stated, "You know, the D.A. did something in this case that I thought was a little disingenuous, and I want to talk about it." He pointed out that the prosecutor had shown the jury a photograph of the house taken on October 21 that showed a wall installed after the incident. Defense counsel argued, "[T]he district attorney decided it would be a good idea to show that [Mario] built a wall [around] his house because he's so afraid of [defendant]. [¶] I thought, wait a second. First of all, why is it even relevant? Why does it matter? That doesn't help you guys decide if he did anything on February 16th. She said she wanted

26

to do this, and I realized, I know why she's doing it. She wants to show you guys that [Mario] is afraid still of [defendant]."

### 3. *Rebuttal*

On rebuttal, the prosecutor began by saying that during his argument, defense counsel "basically personally attacked both Detective Lehigh and myself. He called me a name. He said I was disingenuous. And I think it's unfortunate when attorneys do that to each other. That's not how I practice law." Defense counsel objected, and the trial court overruled the objection, instructing the jury that "argument is just that. It's the argument of counsel. You will ultimately decide what the evidence in the case is."

The prosecutor then argued that defense counsel had failed to "argue the evidence because they're not on his side . . . ." She responded to defense counsel's argument about the evidence of a new wall built by Mario: "So counsel says that I put a picture up that was misleading and, somehow, I was trying to manufacture fear from the witnesses. Ladies and gentlemen, I'm just going to refer you back to the evidence. You heard that 911 call. You heard the fear in Yareth's voice. You saw and heard from the witnesses about how scared they were. I did not need to manufacture anything. [¶] . . . The reason this is relevant is that's an element of the crime. That's why we're talking about this stuff. Sustained fear is an element of criminal threats."

The prosecutor continued to respond to defense counsel's strategy of attacking the inadequacy of police investigation rather than focusing on the facts of the case: "I will remind you that counsel said, quote-unquote, 'Never mind about the law.' I couldn't believe that when I heard that. Never mind about the

27

law?  That is exactly what we're here for.  You are here to determine if the law has been broken.

"So the fact that he did not even address the law or address any of the facts is further evidence that it's because he has no argument because I have proven each of these charges beyond a reasonable doubt.

"I want to stress this.  I said this again before.  This is not about what should have happened.  Detective Lehigh is not on trial.  [Defendant] is.  And what counsel wants you to do—and this is, unfortunately, . . . sometimes a tactic that is sometimes used—is he wants you to speculate.  He wants you to think what if, what if, could that be possible.  He wants you to make assumptions.

"You're actually not allowed to do that.  The judge instructed you, you are not to speculate, you are not to assume. . . .  So what counsel's doing is he's encouraging you to go against the law, and that is not proper."

The prosecutor later added, "when the defense said that the chubby man ran away because Mario Herrera showed a machete. . . .  This was maybe the most flagrant instance of defense asking you to speculate.  There is no evidence of that.  There is no evidence that that is why the chubby man ran away, okay?"

4. *Defense objection*

After the jury began deliberating, defense counsel said that the "district attorney told the jury no less than two times that I had called her names during my closing argument."  Counsel acknowledged that he had called the prosecutor "disingenuous," but insisted that he "did not call her a name."  The trial court denied defense counsel's request for a curative instruction as

28

follows: "Again, I've already instructed them that what each of you say is not evidence, and I'm not going to sit here and separate hairs as to whether calling someone 'disingenuous' is a name. It's calling them something. I'm not saying that's right or wrong. I'm saying that's how the argument came out. That's what was argued in rebuttal to the jury. [¶] So I am declining your invitation to say anything to the jury. I already instructed them what you say is not evidence."

B. Applicable law

The standard governing review of prosecutorial error claims is well-settled. "A prosecutor's conduct violates the Fourteenth Amendment of the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) "Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*Ibid.*)

When attacking the prosecutor's remarks to the jury, the defendant must show that, "'[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.]'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) In conducting this inquiry, the reviewing court does not lightly infer that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's comments. (*Ibid.*)

A prosecutor has wide latitude during closing argument and may argue the case vigorously as long as the argument

29

amounts to fair comment on the evidence and the reasonable inferences or deductions therefrom. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) But "'[a] prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel.' [Citations.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 738.) Personal attacks on defense counsel are impermissible and irrelevant to the issues before the jury. (*People v. Friend* (2009) 47 Cal.4th 1, 30; *People v. Sandoval* (1992) 4 Cal.4th 155, 183–184.)

However, a prosecutor may give his or her opinion on the state of the evidence, vigorously attack the defense case, and focus on the deficiencies in defense counsel's tactics and factual account. (*People v. Redd* (2010) 48 Cal.4th 691, 735.) During summation, counsel may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) A prosecutor may also "'use appropriate epithets warranted by the evidence.'" (*People v. Fosselman* (1983) 33 Cal.3d 572, 580; see also *People v. Hill*, *supra*, at p. 819.)

Any trial court rulings on prosecutorial error are reviewed for abuse of discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 792–793.)

C. Forfeiture

The People argue that defendant forfeited this argument on appeal.

Typically, "'[t]o preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.'" (*People v. Silva* (2001) 25 Cal.4th 345, 373.)

Here, defendant objected to the prosecutor's comments regarding defense counsel's accusations of calling her disingenuous. The trial court promptly admonished the jury that arguments from counsel were not evidence. However, defendant failed to object to or seek an admonition for any other comments made by the prosecutor. And, there is nothing in the appellate record indicating that an objection or a timely request for an admonition would not have cured any potential harm.

Therefore, defendant forfeited his prosecutorial error claim as to any comments made without an objection.

For the sake of completeness, we turn to the merits of defendant's arguments.

D. <u>Prosecutorial error</u>

Defendant argues that the prosecutor committed misconduct[4] during her rebuttal argument by disparaging defense counsel and falsely accusing him of calling her names. However, when viewed in context, the prosecutor's rebuttal was a fair response to specific arguments raised by defense counsel during his closing argument.

---

[4]      We agree with the People that because there is no evidence that the prosecutor intentionally or knowingly committed the alleged misconduct, defendant's claim should be characterized as one of prosecutorial "error" rather than "misconduct." (*People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1 ["We observe that the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error"]; see also ABA House of Delegates, Resolution 100B (Aug. 9-10, 2010) [adopting resolution urging appellate courts to distinguish between prosecutorial "error" and "misconduct"].)

Regarding the prosecutor's comments that defense counsel had "personally attacked" her by calling her "disingenuous", they were made in direct response to defense counsel's argument that "the D.A. did something in this case that I thought was a little disingenuous." In fact, after the arguments concluded, defense counsel admitted that he had called the prosecutor disingenuous. Since the prosecutor was responding directly to an argument made earlier by defense counsel, the comments did not constitute prosecutorial error. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1206 [no prosecutorial error where "[t]he prosecutor's comments responded directly . . . to earlier arguments made by defense counsel"].)

Regarding the remaining comments at issue, they were made in response to defense counsel's arguments concerning the defense strategy of attacking the inadequacies of the police investigation rather than focusing on the evidence presented. As stated earlier, the majority of defense counsel's argument focused on Detective Lehigh's failure to search defendant's house, to interview defendant after his arrest, to search for the missing rifle, and to locate defendant's accomplice—the "chubby" man. The prosecutor's comment that defense counsel had "personally attacked" Detective Lehigh was in response to his repeated arguments that Detective Lehigh had conducted a mediocre investigation despite her extensive law enforcement experience. The prosecutor was entitled to remind the jury that despite the apparent shortfalls during the police investigation, defendant was the one on trial, not Detective Lehigh.

The same is true of the prosecutor's comments about the use of a photograph depicting the new block wall Mario built around his house after the incident. Defense counsel argued to

the jury that the prosecutor was disingenuous in using a photograph of the wall built after the incident to prove that the victims remained in sustained fear when the criminal threats were made on the day of the incident. The prosecutor's argument that she did not try to "manufacture fear" was a proper response to defense counsel's accusation that she was being disingenuous, and constituted a fair comment on the evidence presented at trial to prove the sustained fear element of the criminal threats charge. (*People v. Samayoa, supra*, 15 Cal.4th at p. 841.)

Defendant also takes issue with the prosecutor's comments that defense counsel had suggested the jury "[n]ever mind the law" and "speculate" about the evidence. Although defense counsel did not use these exact words, he did state to the jury, "I'm not going to bother talking about the law because there's so much doubt" while discussing the concept of reasonable doubt. As to the comments about speculation, the prosecutor was simply reminding the jury that defendant's guilt had to be decided solely based on the evidence presented at trial, not on speculation on what additional evidence the prosecutor could have presented.

When considered in the context of the overall defense strategy, "the prosecutor's comments were not a personal attack on defense counsel, but a critical response to his arguments, and thus a 'fair rebuttal' to the defense theory that the case was about" the inadequacies of police investigation. (*People v. Woodruff* (2018) 5 Cal.5th 697, 766.) The prosecutor did not err or commit misconduct.

E. Harmless error

Even if the prosecutor had erred, which she did not, the alleged error was not prejudicial. (*People v. Arias* (1996) 13 Cal.4th 92, 161.) The comments were brief, unrepeated, and

relatively mild.  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [improper appeal for sympathy for the victim did not result in denial of due process where "prosecutor's comment was brief, mild, and not repeated"]; *People v. Martinez* (2010) 47 Cal.4th 911, 957; *People v. Mendoza* (2007) 42 Cal.4th 686, 704.)

Moreover, the trial court instructed the jury that it had to decide the case based only on the evidence presented at trial, and not to let bias or sympathy influence its decision.  The jury was also instructed that evidence is the sworn testimony of witnesses and exhibits admitted into evidence, and not what the attorneys say.  And, the trial court told the jury that "argument is just that. It's the argument of counsel," after defense counsel objected to the prosecutor's rebuttal argument.  We presume the jury followed these instructions.  (See *People v. Edwards* (2013) 57 Cal.4th 658, 764 [presuming jury will follow instruction that statements of attorneys are not evidence]; *People v. Bryden* (1998) 63 Cal.App.4th 159, 184 ["Further, the court instructed the jury that questions and statements by the attorneys do not constitute evidence, and the jury is presumed to follow the court's instructions"].)

Furthermore, as set forth above, the evidence of defendant's guilt was overwhelming.

Under these circumstances, defendant has not established prejudice justifying reversal under either the state law test, requiring a reasonable likelihood of a more favorable verdict but for the alleged misconduct (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1344), or the federal standard because the prosecutor's comments were harmless beyond a reasonable doubt (*People v. Cook* (2006) 39 Cal.4th 566, 608).

III. *The Abstract of Judgment is Corrected*

Defendant contends that the abstract of judgment does not correctly reflect his conviction on count 6. The People agree.

Defendant was convicted on count 6 of violating section 245, subdivision (a)(2), assault with a firearm. However, the abstract of judgment incorrectly indicates that defendant was convicted of "Criminal Threats" on count 6. Consequently, the abstract of judgment should be corrected to accurately reflect defendant's conviction.

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the abstract of judgment to reflect defendant's conviction on count 6 for violating section 245, subdivision (a)(2), assault with a firearm.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
      ASHMANN-GERST

We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT

35